**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | |
| Plaintiffs, | Case No. 4:21-cv-00670-ALM |
| v. | |
| BANK OF AMERICA N.A., | **JURY TRIAL DEMANDED** |
| Defendant. | |
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | |
| Plaintiffs, | Case No. 4:21-cv-00671-ALM |
| v. | |
| WELLS FARGO BANK, N.A., | **JURY TRIAL DEMANDED** |
| Defendant. | |

<u>**DEFENDANTS' P.R. 4-5(b) RESPONSIVE CLAIM CONSTRUCTION BRIEF**</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................................... 1

II.    THE ASSERTED PATENTS ................................................................................. 3

III.    LEGAL STANDARDS .......................................................................................... 3

    A.    Claim Construction ................................................................................... 3

    B.    Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) ................................ 4

    C.    Means-Plus-Function Limitations Under 35 U.S.C. § 112, ¶ 6 (pre-AIA) ............. 5

IV.    ARGUMENT .......................................................................................................... 6

    A.    Issue preclusion and judicial estoppel do not bar any of Defendants' indefiniteness defenses........................................................................................ 6

    B.    "software [authoring / testing] interface" terms....................................... 7

        1.    The "interface" terms are subject to means-plus-function treatment......... 9

        2.    The specification fails to disclose and clearly link any structure for performing the recited functions. .......................... 16

    C.    "network characteristics" ........................................................................ 17

    D.    "indicative of" ........................................................................................ 22

    E.    "the selected characteristics" ................................................................. 28

V.    CONCLUSION.................................................................................................... 30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
  575 U.S. 138 (2015)....................................................................................................7

*Bicon, Inc. v. Straumann Co*.,
  441 F.3d 945 (Fed. Cir. 2006)...................................................................................23

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
  813 F. App'x 522 (Fed. Cir. 2020) .......................................................................5, 28

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998)..................................................................................29

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
  677 F.3d 1361 (Fed. Cir. 2012)............................................................................13, 15

*Clearstream Wastewater Systems, Inc. v. Hydro-Action, Inc*.,
  206 F.3d 1440, 54 U.S.P.Q.2d 1185 (Fed. Cir. 2000) ..............................................23

*Dyfan, LLC v. Target Corp.*,
  28 F.4th 1360 (Fed. Cir. 2022) .................................................................................5, 6

*Eon Corp. IP Holdings v. Silver Spring Networks*,
  815 F.3d 1314 (Fed. Cir. 2016)..................................................................................20

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012).....................................................................................5

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
  766 F.3d 1338 (Fed. Cir. 2014)..................................................................................20

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
  673 F.3d 1361 (Fed. Cir. 2012).....................................................................................6

*Evicam Int'l, Inc. v. Enf't Video, LLC*,
  No. 4:16-CV-105, 2016 WL 6470967 (E.D. Tex. Nov. 2, 2016)............................24

*Exxon Chemical Patents, Inc. v. Lubrizol Corp*.,
  64 F.3d 1553 (Fed. Cir. 1995)....................................................................................23

*Foster v. Hallco Mfg. Co.*,
  947 F.2d 469 (Fed. Cir. 1991)......................................................................................7

ii

*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966) ................................................................................................. 30

*Intell. Ventures II LLC v. BITCO Gen. Ins. Corp.*,
    No. 6:15-cv-59, 2016 WL 125594 (E.D. Tex. Jan. 11, 2016) ................................. 14

*Intell. Ventures II LLC v. FedEx Corp.*,
    No. 2:16-CV-00980-JRG, 2017 WL 5896180 (E.D. Tex. Nov. 29, 2017) .............. 21

*Intelligent Agency, LLC v. 7-Eleven, Inc.*,
    No. 4:20-cv-0185-ALM, 2022 WL 760203 (E.D. Tex. Mar. 11, 2022) ................... 30

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999) ..................................................................... 11, 15

*MacroPoint, LLC v. Ruiz Food Prods., Inc.*,
    No. 6:16-cv-1133-RWS-KNM, 2018 WL 887434 (E.D. Tex. Feb. 14, 2018) ........ 14

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc) ............................................................. 14

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
    248 F.3d 1303 (Fed. Cir. 2001) ..................................................................... 6, 16

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ......................................................................... 26

*Nautilus Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ........................................................................................... 5

*Negotiated Data Sols., LLC v. Dell, Inc.*,
    596 F. Supp. 2d 949 (E.D. Tex. 2009) ............................................................... 21

*NTP, Inc. v. Rsch. In Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) ......................................................................... 26

*Perdiem Co. v. IndusTrack LLC*,
    No. 2:15-cv-727-JRG-RSP, 2016 WL 3633627 (E.D. Tex. July 7, 2016) ............. 15

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................. 3, 4, 22

*Prolifiq Software Inc. v. Veeva Sys. Inc.*,
    No. C 13-03644 SI, 2014 WL 3870016 (N.D. Cal. Aug. 6, 2014) ........................ 25

*Seagen Inc. v. Daiichi Sankyo Co.*,
    No. 2:20-CV-00337-JRG, 2021 WL 4168660 (E.D. Tex. Sept. 14, 2021) ............ 20

*Uniloc 2017 LLC v. Google LL*,
    No. 2:18-CV-00493-JRG-RSP, 2020 U.S. Dist. LEXIS 9748 (E.D. Tex. Jan.
    20, 2020) ................................................................................................................27

*Uniloc USA, Inc. v. AVG Techs. USA, Inc.*,
    No. 2:16-CV-00393, 2017 WL 3498496 (E.D. Tex. Aug. 16, 2017) ....................................26

*Versata Software, Inc. v. Zoho Corp.*,
    213 F. Supp. 3d 829 (W.D. Tex. 2016)................................................................................24

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
    887 F.3d 1376 (Fed. Cir. 2018)..........................................................................................7

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) (en banc)......................................................................5, 9, 10

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999).........................................................................................6, 17

**Statutes**

35 U.S.C. § 112........................................................................................................................13, 25

35 U.S.C. § 112, ¶ 2..............................................................................................................2, 4, 5

35 U.S.C. § 112, ¶ 6..........................................................................................................1, 5, 9, 17

## I.      INTRODUCTION

The Court should adopt Defendants Bank of America N.A. and Wells Fargo Bank, N.A.'s (collectively, "Defendants") proposed constructions for each of the disputed claim terms.  Many of the claims of the patents asserted by Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. (collectively, "Wapp") are indefinite—a consequence of Wapp's repeated use of ambiguous terminology in its claims.

The claim terms "software authoring interface" in the '192 Patent and "software testing interface" in the '678 Patent are subject to means-plus-function treatment because these claim terms do not connote sufficiently definite structure to a person of ordinary skill in the art. Defendants have provided evidence, including the declaration of expert witness Dr. Sandeep Chatterjee, showing that "interface" alone and in the context of the full claim phrases does not connote structure, but is instead a generic, black-box nonce word.  Thus, the interface terms are subject to means-plus-function treatment under 35 U.S.C. § 112, ¶ 6.  These claim terms are therefore invalid because the specification of the '192 and '678 Patents fails to disclose and clearly link any corresponding structure or algorithm for performing the functions recited in the claims, a point Wapp falls far short of rebutting.

The term "network characteristics" refers to "characteristics of the network, regardless of whether they are identified directly or identified as events."  This construction is derived from the plain and ordinary meaning of "network characteristics" in light of the intrinsic record—indeed it is confirmed by the analysis conducted by Wapp's expert in *Wapp v. Micro Focus*, in which Wapp's expert offered this very understanding of the term.  Wapp fails to substantively explain why its own expert's description of "network characteristics" is wrong or differs from the plain meaning. Defendants simply ask the Court to adopt a construction that Wapp already agreed is correct.

1

The term "indicative of" is indefinite in the context of the Asserted Patents because the Asserted Patents fail to disclose with reasonable certainty which characteristics are "indicative of" a network, mobile device, or performance as opposed to which characteristics are not "indicative of" a network, mobile device, or performance.  Any given device or network has a multitude of characteristics.  Yet, aside from a few limited examples, the specification offers no guidance as to which of these characteristics are "indicative" characteristics and which are not.

The term "the selected characteristics" in the '579 Patent lacks antecedent basis.  As Dr. Chatterjee explains, this term lacks any reasonably ascertainable meaning, and it is therefore indefinite under 35 U.S.C. § 112, ¶ 2.  Wapp argues that "the selected characteristics" refers back to a different claim term, "one or more characteristics," but during prosecution of the '579 Patent, the applicant expressly amended the claim limitation by deleting "one or more" and inserting "selected."  Wapp's incorrect argument violates blackletter law that a patentee cannot recapture ground surrendered by an amendment during prosecution.

Faced with evidence that its Asserted Patents are invalid for indefiniteness, Wapp interjects the argument that issue preclusion and judicial estoppel prevent Defendants from arguing indefiniteness for the '192, '678, and '864 Patents, parroting arguments from Wapp's motion for partial summary judgment.  As explained in Defendants' responsive briefing, Wapp cannot avoid these indefiniteness challenges because, among other reasons, issue preclusion does not apply to this wholly distinct litigation involving new accused products and because the specific indefiniteness arguments Defendants assert were not actually litigated and determined in the prior litigation.  Defendants' proposed claim constructions were not previously presented by any party.

Accordingly, the Court should adopt Defendants' proposed constructions for all terms.

## II.     THE ASSERTED PATENTS

The five asserted patents are related to one another and generally relate to "emulat[ing] an application" running on a "mobile device." *See, e.g.*, '192 Patent, Abstract; '864 Patent, Abstract; '678 Patent, Abstract; '811 Patent, Abstract; '579 Patent, Abstract.  The asserted patents involve simulating one or more "network characteristics" or other "characteristics" relating to a mobile device. *See, e.g.*, '192 Patent, Claim 1; '864 Patent, Claim 1; '678 Patent, Claim 45; '811 Patent, Claim 1; '579 Patent, Claim 1.

In prior litigation, the Court construed certain terms in the '192, '864, and '678 Patents. *See* Ex. 6.[1]  The Parties have agreed those constructions should apply in this case, including for identical terms recited in the newly asserted '811 and '579 Patents.  *See* Case No. 4:21-cv-670-ALM ("-670 Case"), Dkt. 49, at 2–3 ("JCCS").[2]  This brief addresses new terms not previously addressed by the parties or construed by the Court.

## III.    LEGAL STANDARDS

### A.     Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *Id.* at 1313.  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *Id.* at 1314.  The general rule is that each claim term is

---

[1] For ease of reference, Defendants have numbered exhibits consecutively.  Thus, Exhibits 1–48 refer to the exhibits filed with Plaintiff's opening brief.  Exhibits 49–52 are filed herewith.
[2] The same Joint Claim Construction Statement was filed in Case No. 4:21-cv-671-ALM ("-671 Case") at Docket 48.

construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Id.* at 1312–13.

"The claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). A term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1314–15 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Id.* at 1316.

Expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* at 1317.

### B.     Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA)[3]

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence,

---

[3] All patents claim priority via one or more continuations or divisionals to an application filed no later than June 9, 2006. Thus, pre-AIA law applies to all asserted claims.

must "inform those skilled in the art about the scope of the invention with reasonable certainty."
*Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  If it does not, the claim fails
§ 112, ¶ 2 and is invalid as indefinite.  *Id.* at 901.  Whether a claim is indefinite is determined from
the perspective of a person of ordinary skill in the art ("POSITA") as of the time the application
for the patent was filed.  *Id.* at 911.  "[I]ndefiniteness is a question of law and in effect part of claim
construction."  *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

The lack of antecedent basis ordinarily "signals a potential indefiniteness problem but does
not end the inquiry."  The Court must still assess whether the term has a "reasonably ascertainable
meaning."  *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2020).
If there is no reasonably ascertainable meaning, the claim is invalid as indefinite.  *Id.*

### C.      Means-Plus-Function Limitations Under 35 U.S.C. § 112, ¶ 6 (pre-AIA)

The means-plus-function analysis is a two-step process.  First, the Court must "determine
whether a claim limitation is drafted in means-plus-function format."  *Dyfan, LLC v. Target Corp.*,
28 F.4th 1360, 1365 (Fed. Cir. 2022).  This requires "constru[ing] the limitation to determine
whether it connotes sufficiently definite structure to a person of ordinary skill in the art.  If the
limitation connotes sufficiently definite structure, it is not drafted in means-plus-function format,
and § 112 ¶ 6 does not apply."  *Id.*  For claim terms that do recite the word "means," a rebuttable
presumption exists that means-plus-function treatment does not apply.  *Id.*  That presumption can
be overcome if the challenger "demonstrates that the claim term 'fails to "recite sufficiently
definite structure."'"  *Id.*; *see also Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed.
Cir. 2015) (en banc).  "Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce
words that reflect nothing more than verbal constructs may be used in a claim in a manner that is
tantamount to using the word 'means' because they 'typically do not connote sufficiently definite
structure.'"  *Id.* at 1350.

If the limitation is in means-plus-function format, the Court proceeds to the second step of "determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" *Dyfan*, 28 F.4th at 1365.  A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).  Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*  If the corresponding structure is a computer, "the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).  If no algorithm is disclosed, the claim is invalid for failing to disclose corresponding structure.  *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012).

## IV.   ARGUMENT

### A.   Issue preclusion and judicial estoppel do not bar any of Defendants' indefiniteness defenses.

Initially, Wapp rehashes its partial summary judgment motion arguments that Defendants may not pursue any indefiniteness challenges to terms in the '192, '864, and '678 Patents based upon issue preclusion and judicial estoppel.  *See* -670 Case, Dkt. 73 ("Op. Br."), at 6–8.[4]  Defendants therefore incorporate their briefing in response to Wapp's motion for partial summary judgment.  *See* -670 Case, Dkts. 60 (Opposition), 70 (Sur-reply); -671 Case, Dkts. 55 (Opposition), 64 (Sur-reply).  As fully briefed previously, neither of those legal doctrines prevent Defendants

---

[4] The same opening claim construction brief was filed in the -671 Case at Docket 66.

from raising any invalidity defenses in this case, particularly given that Wapp asserts wholly distinct infringement claims against new accused products.  *See Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 480–81 (Fed. Cir. 1991).  Furthermore, even if issue preclusion were to apply, it would not preclude any indefiniteness arguments raised in this brief because they are being raised for the first time—the specific indefiniteness arguments in this brief were never "actually litigated and determined" in the prior litigation.  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015); *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1383–84 (Fed. Cir. 2018) (holding that an invalidity theory raised in a prior suit was not barred because the trial court "did not evaluate" whether the patent was invalid on that basis, and therefore the "actually litigated" element of issue preclusion was not satisfied).  Thus, and as further explained in Defendants' briefing on the partial summary judgment motion, issue preclusion and judicial estoppel do not bar any indefiniteness argument raised in these claim construction proceedings.

**B.**     **"software [authoring / testing] interface" terms**

| Term (Patent/Claim) | Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a software authoring interface configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application … further configured to simulate a network connection state encountered by the mobile device"<br><br>('192 Patent, Claim 1) | Plain and ordinary meaning.  (But any words or phrases with an agreed construction should be given their agreed construction.) | Means-plus-function term. This term is indefinite.<br><br>Function: simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application and simulate a network connection state encountered by the mobile device<br><br>Structure: This term is indefinite for lack of sufficient corresponding structure in the specification. |

| Term (Patent/Claim) | Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "the software authoring interface is configured to enable a user to select from one or more connection simulations for testing how well mobile content performs on the mobile device"<br><br>('192 Patent, Claim 2) | Plain and ordinary meaning. (But any words or phrases with an agreed construction should be given their agreed construction.) | Means-plus-function term. This term is indefinite.<br><br>Function: enable a user to select from one or more connection simulations for testing how well mobile content performs on the mobile device<br><br>Structure: This term is indefinite for lack of sufficient corresponding structure in the specification. |
| "a software testing interface configured to simultaneously visually simulate, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application"<br><br>('678 Patent, Claim 45) | Plain and ordinary meaning. (But any words or phrases with an agreed construction should be given their agreed construction.) | Means-plus-function term. This term is indefinite.<br><br>Function: simultaneously visually simulate, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application<br><br>Structure: This term is indefinite for lack of sufficient corresponding structure in the specification. |

Claims 1 and 2 of the '192 Patent recite a "software authoring interface configured to" perform certain functions. Claim 45 of the '678 Patent similarly recites a "software testing interface configured to" perform certain functions. As discussed further below, each of these claim terms is subject to means-plus-function treatment because the terms "software authoring interface" and "software testing interface" do not recite sufficiently definite structure to a POSITA, as explained by Dr. Chatterjee. Ex. 8 ¶¶ 26–66, 78–84. The specification also fails to describe and

clearly link any structure for performing the recited functions.  *Id.* ¶¶ 67–76, 85–91.  Thus, each of these claim terms is indefinite under 35 U.S.C. § 112, ¶ 6.

**1.    The "interface" terms are subject to means-plus-function treatment.**

The "interface" terms in the '192 and '678 Patents are subject to means-plus-function treatment.  The evidence cited below, including the testimony of expert Dr. Sandeep Chatterjee, clearly shows the phrases "software authoring interface" and "software testing interface" do not recite sufficiently definite structure to a POSITA, and it therefore overcomes the rebuttable presumption that means-plus-function treatment does not apply.  The "interface" terms should therefore be treated as means-plus-function terms under 35 U.S.C. § 112, ¶ 6.

Wapp's formulation is really no different than the claim term "distributed learning control module," which the Federal Circuit held was subject to means-plus-function treatment because it used the "nonce" word "module," which "is simply a generic description for software or hardware that performs a specified function."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015).  As the Federal Circuit explained, "the word 'module' does not provide any indication of structure because it sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used."  *Id.*  The Federal Circuit also observed that "[t]he prefix 'distributed learning control' does not impart structure into the term 'module.' These words do not describe a sufficiently definite structure."  *Id.* at 1351.

This case is on all fours with *Williamson*, as Dr. Chatterjee's testimony shows.  Here, the word "interface" is a nonce word that does not provide any indication of structure but is a generic black box, just like the word "means."  As Dr. Chatterjee explained, "the term 'interface' would be understood by a POSITA as not referring to any particular structure or class of structures but a generic, black-box term or nonce word."  Ex. 8 ¶¶ 28, 78.  Dr. Chatterjee also identified numerous examples of different types of "interfaces" that may involve vastly different structures, confirming

9

that the word "interface" itself does not connote structure. *Id.* Dr. Chatterjee also explained that the full claim phrases "software authoring interface" and "software testing interface" are not "well-known term[s] of art" and do not "reference any known prior art device or class of devices." *Id.* Just as in *Williamson*, the prefixes "software authoring" and "software testing" do not impart any structure either. Dr. Chatterjee explained these prefixes are a mere "functional description" that do not identify structure either alone or in the context of the surrounding claim language. Ex. 8 ¶¶ 29, 79. Thus, the "software authoring interface" and "software testing interface" terms are subject to means-plus-function treatment, just as in *Williamson*.

The intrinsic evidence does not provide any structural meaning for "software authoring interface" or "software testing interface." Indeed, neither of these phrases is used in the specification or file history; the phrases are only used in the claim language. Ex. 8 ¶¶ 30, 80; *see also* '192 Patent; '678 Patent. The specification consistently describes the invention using vague terms like "system" that fail to connote any structure. *E.g.*, '192 Patent[5] at 2:61–63 ("Fig. 1A shows one exemplary embodiment of a **system** for emulating, authoring and visually profiling an application"); Ex 8 ¶ 30. The remainder of the specification and the file history likewise fail to provide any structure for a "software authoring interface" or "software testing interface." *Id.* ¶¶ 31–59, 79–82.

Moreover, the specification confirms that "interface" is a generic term that fails to connote structure. The specification uses the word "interface" in many disparate contexts, such as "user interface" ('192 Patent at 4:15); "interface (not shown) that provides communication … via one or

---

[5] The '192 and '678 Patents share substantially the same specification. Op. Br. at 2 (admitting the same). Defendants are citing the '192 Patent for convenience, but the citations apply with equal force to the "software testing interface" term recited in the '678 Patent.

more of USB, Ethernet, infrared, Bluetooth, Wifi and other similar communication media" (*id.* at 6:65–7:1); "operator interface" (*id.* at 10:40–42); and "network simulator interface" (*id.* at 11:5–7).  The Federal Circuit has held that "[v]aried use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition."  *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999).  Dr. Chatterjee likewise explains that these "widely varying references to 'interface' confirm that 'interface' is a generic term that does not connote any specific structure or class of structures, but is instead used as mere verbiage connected to a wide variety of possible functions."  Ex. 8 ¶ 30.  Thus, the intrinsic evidence supports that these claim terms do not recite sufficiently definite structure to a POSITA and are therefore subject to means-plus-function treatment.  *Id.*

Wapp's own extrinsic evidence bolsters this conclusion.  Wapp identified a wide variety of extrinsic evidence using the term "interface" in different contexts and referring to vastly different structures.  *See, e.g.*, Exs. 23 ("interface"), 24 ("user interface"), 25 ("application programming interface," "graphical user interface"), 30 ("network interface"), 49 ("user interface," "electrical interfaces," "I/O interface," "16-bit PCMCIA PC Card [3] interface," "standards-based narrowpath interfaces," "man-to-machine interfaces," "physical design and tactile interfaces," "network interface cards," "CompactPCI interface," "graphical user interfaces," "natural language interfaces," "32-Bit CardBus Interface," "synchronous serial interfaces (SPI interface)," and "asynchronous parallel interface").  As Dr. Chatterjee explained, this evidence shows the term "interface" by itself does not connote any particular structure or class of structures.  Ex. 8 ¶¶ 61–65.  For example, Dr. Chatterjee explains the IEEE provides four different definitions of "interface," one of which does not apply and three of which are vague functional definitions that do not identify any structure.  Ex. 8 ¶ 63; *see also* Ex. 23 at WAPP_MARKMAN_0002247–48

(definition 2 identifying interface as "[a] hardware or software component"—i.e., a generic black box—"that connects two or more other components"—i.e., that performs the generic, nonstructural function of "connecting" two other things).  Dr. Chatterjee observes that the Microsoft Computer Dictionary definition also includes "a vague functional description" and refers to two separate irrelevant definitions.  Ex. 8 ¶ 62; *see also* Ex. 25 at WAPP_MARKMAN_0002288 (providing two conflicting definitions of "interface" as "software" or "a card, plug, or other device that connects pieces of hardware").  Dr. Chatterjee also explained that while some *phrases* using the term "interface" may connote a particular structure, the term "interface" by itself does not.  Ex. 8 ¶ 64 (explaining that "16-bit PCMCIA PC Card interface" refers to "a specific set of electrical connections arranged in a specific physical pattern that operate according to the specified standard" even though "interface" by itself "does not connote any particular structure").

Wapp's argument that these claim terms are not subject to means-plus-function treatment fails for several reasons.  First, Wapp contends that "[b]oth parties' experts acknowledge that 'interface' was known by skilled artisans as a name for structure."  Op. Br. at 9 (citing Ex. 7 ¶ 31; Ex. 8 ¶ 28).  Not so.  Wapp mischaracterizes Dr. Chatterjee's opinions.  He merely stated certain unclaimed phrases, such as "Application Programming Interface" and "user interface," have meaning, but he did not agree the term "interface" alone has meaning.  Ex. 8 ¶ 28.  Indeed, in the very paragraph Wapp cites, Dr. Chatterjee explained these examples "show that interface can be software … or hardware … showing that 'interface' by itself does not refer to any particular structure or class of structures."  *Id.*  Thus, Dr. Chatterjee did not agree "interface" by itself refers to any structure.

Wapp's own expert's contention that "interface" refers to structure is also wrong. Dr. Malek opined "interface" would "connote structure—specifically, a user interface." Ex. 7 ¶ 31.

12

But the term "user interface" is not recited in the claims, despite the inventors' awareness of the term and its usage elsewhere in the specification. *See, e.g.*, '192 Patent at 3:6–7, 3:18, 4:15, 4:20, 9:7. Neither Dr. Malek nor Wapp offers any justification for substituting the phrase "user interface" (a term the inventors knew and used in the specification) for the recited claim phrases "software authoring interface" or "software testing interface." *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (noting "general presumption that different terms have different meanings"). And as explained above, the inventors used the term "interface" in other, varied contexts in the specification. *See, e.g.*, '192 Patent at 6:65–7:1 ("interface (not shown) that provides communication … via one or more of USB, Ethernet, infrared, Bluetooth, Wifi and other similar communication media"), 10:40–42 ("operator interface"), 11:5–7 ("network simulator interface"). Thus, Wapp's attempt to limit the term "interface," which is used in a variety of contexts, to only a "user interface" conflicts with general principles of claim construction. The varied examples in the specification support that "interface" itself connotes no structure, but instead is a generic, black-box nonce word that can be used in combination with other words to refer to myriad concepts.

Next, Wapp argues Defendants' invalidity contentions somehow support its argument. Op. Br. at 10–11. But Wapp did not timely identify these contentions as extrinsic evidence and thus has waived reliance on them. *See* Dkt. 49-1 (JCCS Ex. A), at 1–6 (no reference to invalidity contentions); P.R. 4-2 (requiring disclosure of extrinsic evidence). Moreover, Defendants' charts expressly state they are based on Wapp's "apparent construction of the claims, as set forth in Wapp's Infringement Contentions." *E.g.*, Ex. 9, at A03-1. Defendants also expressly stated they did not concede any claim satisfies § 112. *Id.* Further, the mere fact Defendants identified certain disclosures in prior art is not inconsistent with arguing the claim limitations at issue do not connote

sufficiently definite structure to a POSITA.  The ***prior art's*** identification of particular structures of a "user interface" or "graphical user interface" does not mean that the ***claim language*** connotes sufficient structure (either "interface" alone or the full phrases "software authoring interface" and "software testing interface").  Thus, the invalidity contentions do not support Wapp's arguments.

Wapp next contends Defendants conceded "'interface' connotes a user interface structure" in prior *Markman* briefing.  Op. Br. at 11.  Not so.  Defendants, as part of arguing the term "the software" was indefinite, stated interfaces "***more frequently*** refer to the visual presentation of information."  Ex. 17, at 29 (emphasis added).  The phrase "more frequently" makes clear that—consistent with Defendants' position here—the term "interface" has a wide variety of potential meanings.  Moreover, the quoted statement references only a function ("the visual presentation of information"), but not any structure and thus does not support Wapp's argument.

Wapp's case law is inapposite.  *Zeroclick, LLC v. Apple Inc.* did not involve any claim term reciting the word "interface."  891 F.3d 1003, 1008 (Fed. Cir. 2018).  Moreover, the Federal Circuit held the claim terms in question referred to "conventional graphical user interface programs or code."  *Id.*  Neither Wapp nor its expert has contended the claim terms here refer to any "conventional" program, and Dr. Chatterjee has testified they do not.  Ex. 8 ¶¶ 28, 78.  Wapp's remaining cases do not support that "interface" by itself connotes structure.  These cases instead rely on specific disclosures in other patents to support that the full claim terms at issue connoted structure.  *E.g.*, *Intell. Ventures II LLC v. BITCO Gen. Ins. Corp.*, No. 6:15-cv-59, 2016 WL 125594, at *14 (E.D. Tex. Jan. 11, 2016) (finding term definite "[i]n context of the specification passages and figures"); *MacroPoint, LLC v. Ruiz Food Prods., Inc.*, No. 6:16-cv-1133-RWS-KNM, 2018 WL 887434, at *6 (E.D. Tex. Feb. 14, 2018) (finding term definite based on what the

"intrinsic evidence demonstrates"); *Perdiem Co. v. IndusTrack LLC*, No. 2:15-cv-727-JRG-RSP, 2016 WL 3633627, at *43–44 (E.D. Tex. July 7, 2016) (relying on intrinsic evidence).

Wapp next mischaracterizes Dr. Chatterjee's testimony as arguing that "although 'interface' is structural, it connotes too broad a class of structures."  Op. Br. at 12.  But Dr. Chatterjee clearly and unambiguously stated "interface" did not connote structure.  Ex. 8 ¶¶ 28, 78.  Wapp's argument is thus irrelevant.

Wapp next contends the claim terms refer to "a user interface."  Op. Br. at 12–13.  As noted above, Wapp provides no justification for why the term "interface" should be substituted for the different term "user interface," which the inventors knew and used elsewhere in the patents. *Chicago Bd.*, 677 F.3d at 1369.  Further, Wapp ignores the clear implication of the varied use of the word "interface" in the specification—such wide and varied usage supports the conclusions that the term has a broader meaning rather than being limited to the one specific term Wapp relies on. *Johnson*, 175 F.3d at 991.

Wapp further contends the claim language supports its position that the disputed terms are a "user interface, rather than a non-visual interface such as an API."  Op. Br. at 13.  Wapp's argument improperly focuses on only part of the claim language.  As the parties' agreed construction shows, the "software authoring interface" must "**emulate simultaneously**, **and display**."  Dkt. 48, at 2 (emphasis added).  Thus, the claim terms are not merely a display (or user interface), but also must perform the non-user interface function of "emulat[ing] simultaneously."  The claim language cuts against Wapp's construction by demonstrating the "software [authoring / testing] interface" must do more than merely provide a (visual) user interface.

Wapp next identifies alleged support in the specification, focusing on the term "authoring environment."  Op. Br. at 14–15.  But Wapp fails to identify any evidence linking the term

"authoring environment" to the meaning of the term "interface" (either alone or in the context of the full claim phrases). Additionally, the evidence Wapp cites does not show any "authoring" functionality at all, further undermining Wapp's argument. *See, e.g.*, '192 Patent figs.5 & 12; Op. Br. at 15 (describing figures as showing "configuring" and "testing" an application, but not "authoring").

Accordingly, both the intrinsic and the extrinsic evidence demonstrate the terms "software authoring interface" and "software testing interface" do not connote structure to a POSITA and are therefore subject to means-plus-function treatment.

### 2. The specification fails to disclose and clearly link any structure for performing the recited functions.

The interface terms must perform the functions recited above in Defendants' proposed construction, which are identified by the plain claim language. *See supra* at 7–8; '192 Patent, Claims 1, 2; '678 Patent, Claim 45. Neither Wapp nor its expert disputes these functions; indeed, they do not identify the function of the claim limitations at all. *See* Op. Br. at 17; Ex. 7 ¶¶ 45, 68.

The specification fails to disclose corresponding structure for at least two reasons. First, no structure is clearly linked to the recited claim functions. Ex. 8 ¶¶ 70, 88. Wapp does not address this requirement at all. Op Br. at 17. Wapp's expert likewise fails to acknowledge this requirement. Ex. 7 ¶¶ 45, 68. Thus, it is undisputed that the specification does not "clearly link[] or associate[] [any] structure to the function recited in the claim." *Medtronic*, 248 F.3d at 1311.

Second, the specification fails to disclose any algorithm for performing the recited function. The corresponding structure for this claim must be an algorithm because the invention operates on a computer, as admitted in the specification. *E.g.*, '192 Patent at 5:40–41. Additionally, the disputed claims recite "display windows," confirming that the function is carried

out by a computer.  Thus, the patent must disclose an algorithm for performing the recited function.
*WMS Gaming*, 184 F.3d at 1349.

The function includes, by the parties' agreed construction, "emulate simultaneously and display one or more windows showing resources of the mobile device that are available to the application."  JCCS at 2–3.  Dr. Chatterjee explains that the specification does not describe any algorithm for "displaying the *availability* of resources for any network characteristic."  Ex. 8 ¶ 72; *see also id.* ¶ 90.  He reviewed numerous figures and the specification and found no such disclosure.  *Id.* ¶¶ 72–75.  Neither Wapp nor its expert addresses the parties' agreed construction or identifies any algorithm for performing that function.  Op. Br. at 17; Ex. 7 ¶¶ 45, 68.

Thus, Dr. Chatterjee's unrebutted testimony establishes the specification fails to disclose corresponding structure for the "interface" terms, confirming their invalidity under 35 U.S.C. § 112, ¶ 6.

### C.    "network characteristics"

| Term (Patent/Claim) | Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "network characteristics" <br><br> ('192 Patent, Claim 1; '864 Patent, Claim 1; '678 Patent, Claim 45; '579 Patent, Claims 25, 26) | Plain and ordinary meaning. | "characteristics of the network, regardless of whether they are identified directly or identified as events" |

The intrinsic record and Wapp's own position in prior litigation compel Defendants' construction of "network characteristics."  Both parties' experts agree that the plain and ordinary meaning of "network characteristics" includes "uplink data rate, downlink data rate, delay, latency, packet loss, congestion, packet jitter, [and] throughput."  Ex. 31, Malek Validity Report ¶ 243; Ex. 8, Chatterjee Decl. ¶ 141.  But in the context of the '192, '864, and '678 patents, network characteristics are specifically described in Figure 12 of the patents.  In fact, Wapp itself admits

17

"Figure 12 of the common specification provides written description support for the term 'network characteristics.'"  Op. Br. at 18.  Wapp's expert Dr. Malek explains that Figure 12 "describes one exemplary embodiment 'to allow the user to select desired network characteristics for simulation.'"  Ex. 31, Malek Validity Report ¶ 243 (quoting '678 patent, col. 12:22–25); Ex. 8, Chatterjee Decl. ¶ 143.  In Figure 12, rather than directly selecting network characteristics such as data rate or latency, a user selects events such as "check email" and "check messages."



'678 patent, Fig. 12 (highlighting added).

The specification confirms that in Figure 12, network characteristics may be simulated through the control of events:

> Window 1200 shows a pull-down list 1202 of network characteristics that may be simulated by simulator 810.  **For example, simulator 810 may allow control of scripted events** (e.g., cell tower identification, service message, bandwidth, etc.), **consumer events** (e.g., checking email, checking messages, browsing network, available minutes, selecting images, etc.) **and incoming events** (e.g., phone calls, WAP Messages, receiving MMS, receiving SMS, etc.).

'678 patent, col. 12:26–33 (emphasis added); *see also id.* at 12:22–25 ("window 1200, FIG. 12, is displayed to allow the user to select the desired network characteristics for simulation").

Accordingly, network characteristics include not only directly identified characteristics but also characteristics identified as events, such as the events stated in the specification.  Wapp nowhere disputes that Defendants' construction of "network characteristics" is the term's ordinary meaning in light of the intrinsic record.  As Wapp acknowledges, its expert stated the following in his validity expert report in *Wapp v. Micro Focus*:

> As such, it is my opinion that a person of ordinary skill would understand network characteristics to refer to **characteristics of the network, regardless of whether they are identified directly** (e.g., such as by selecting bandwidth**), or identified as events** (e.g., such as by selecting network activity that determines characteristics of a network from the perspective of a server or client (e.g., a mobile phone)).

Ex. 31, Malek Validity Report ¶ 243 (emphasis added).  Defendants' proposed construction of "network characteristics" is precisely Wapp's construction as emphasized above.

Yet, despite Wapp's apparent agreement with this construction of "network characteristics," Wapp continues to argue that the term should only have its "plain meaning."  In doing so, Wapp reserves its ability to narrow its construction of "network characteristics" for purposes of anticipation and obviousness, despite using a broad construction in the context of written description.  Ex. 31, Malek Validity Report ¶ 243.  Absent a construction, Wapp would potentially be able to exclude the very embodiment of network characteristics Wapp cited for written description support.  Ex. 31, Malek Validity Report ¶ 243.  That would be error.  "A claim construction that excludes a preferred embodiment is rarely, if ever correct and would require

19

highly persuasive evidentiary support." *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) (cleaned up).  A construction expressly stating a term's plain meaning is appropriate where a construction "would be helpful to resolve the dispute between the parties." *Seagen Inc. v. Daiichi Sankyo Co.*, No. 2:20-CV-00337-JRG, 2021 WL 4168660, at *6 (E.D. Tex. Sept. 14, 2021) (construing "drug moiety" as "drug unit" where "the specification equates 'drug moiety' to 'drug unit,' which is consistent with the plain meaning of the term").  And, where it is disputed, a court can and should state a term's plain meaning in light of the intrinsic record.  *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1321 (Fed. Cir. 2016) (finding that in view of the intrinsic record, the plain meaning of "portable" and "mobile" could not be "broadly interpreted as including, essentially, anything that is theoretically capable of being moved").

Wapp has few substantive critiques of Defendants' actual claim construction.  Without explaining why it would be contrary to plain meaning, Wapp argues Defendants' proposed construction is wrong because it uses the word "identified," which is not found in the specification. Op. Br. at 18.  But the preferred embodiment in Figure 12 "is displayed to allow the user to select the desired network characteristics for simulation," '678 patent, col. 12:22–25, which is exactly what is described by Defendants' construction.  Indeed, Wapp's own expert used the same word "identified" in setting forth the meaning of the claim term.  Ex. 31, Malek Validity Report ¶ 243. To the extent the Court prefers to use the term "select" or "selected" as stated in the specification rather than "identified," Defendants believe such a construction would be equivalent.

In the alternative, Wapp argues Defendants' construction should be modified to include the particular examples Dr. Malek used in his validity report.  Op. Br. at 20.  Wapp's injection of examples into the construction would be inappropriate.  First, Wapp seeks to insert "bandwidth" as an example of a network characteristic, when both parties agree there are a litany of other

examples including "uplink data rate, downlink data rate, delay, latency, packet loss, congestion, packet jitter, [and] throughput."  Ex. 31, Malek Validity Report ¶ 243; Ex. 8, Chatterjee Decl. ¶ 141.   Not coincidentally, Wapp's infringement allegations emphasize "bandwidth" as a characteristic allegedly found in the accused products.  *See, e.g.*, Exs. 50, 51, Wapp's Infringement Contentions Ex. F at 7 ("Network Link Conditioner is an application that simulates/emulates network characteristics such as bandwidth limitations").  Wapp's example would "unnecessarily emphasize" one particular example at the expense of others and should therefore be rejected. *Negotiated Data Sols., LLC v. Dell, Inc.*, 596 F. Supp. 2d 949, 963 (E.D. Tex. 2009).

Wapp's proposal to include the parenthetical "(e.g., such as by selecting network activity that determines characteristics of a network from the perspective of a server or client (e.g., a mobile phone))" (Op. Br. at 20) should also be rejected.  As with the "bandwidth" example, the example of a "mobile phone" is needlessly limiting and prejudicial in view of Wapp's infringement allegations against Defendants' mobile applications running on mobile phones.  *See, e.g.*, Exs. 50, 51, Infringement Contentions Ex. F at 7 (accusing "Network Link Conditioner on an iOS Device (e.g., iPhone 12)").  And the larger example should be excluded as unnecessarily complicating an otherwise "concise construction."  *Intell. Ventures II LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG, 2017 WL 5896180, at *43 (E.D. Tex. Nov. 29, 2017) ("[e]xamples are not substantive limitations" even where they are "potentially helpful").  The experts can readily explain the patents' disclosure of events using Figure 12 and the numerous examples in the specification.

Accordingly, the Court should construe "network characteristics" as "characteristics of the network, regardless of whether they are identified directly or identified as events."

### D.     "indicative of"

| Term (Patent/Claim) | Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "indicative of"<br><br>('192 Patent, Claim 1; '864 Patent, Claim 1; '678 Patent, Claim 45; '811 Patent, Claims 1, 4, 9, 22, 24; '579 Patent, Claim 7) | Plain and ordinary meaning. | Indefinite |

The asserted patents recite "indicative of" to modify and potentially broaden the scope of various characteristics:  characteristics "indicative of" a mobile device ('811 Patent, Claims 1, 9, 22), characteristics "indicative of" a network ('811 Patent, Claims 1, 24; '579 Patent, Claim 7), and network characteristics "indicative of" performance of a mobile device ('192 Patent, Claim 1; '864 Patent, Claim 1; '678 Patent, Claim 45).  The "indicative of" terms are indefinite because a POSITA would not know with reasonable certainty how characteristics *indicative of* a mobile device / a network / performance differ, if at all, from characteristics *of* a mobile device / a network / performance based on the intrinsic and extrinsic evidence.  The claim language and the specification fail to provide sufficient context to allow a POSITA to appreciate the meaning of the "indicative of" terms with reasonable certainty.  Indeed, as shown in the prosecution history of the '579 Patent, Wapp has always understood that adding "indicative" to the claim language would introduce ambiguity, but nonetheless chose to do so to take advantage of the perceived flexibility the term provides.  Such intentional ambiguity cannot be cured by Wapp's extrinsic evidence.

As a preliminary matter, Wapp errs in emphasizing extrinsic evidence to argue "indicative of" should be accorded a "plain and ordinary meaning."  Op. Br. at 21.  Wapp's approach contradicts the Federal Circuit's clear mandate to begin with intrinsic evidence.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (holding that extrinsic evidence is

"less significant than the intrinsic record in determining the legally operative meaning of claim language").

Here, the intrinsic evidence fails to provide sufficient disclosure to allow a POSITA to appreciate the scope of the "indicative of" terms with reasonable certainty. Ex. 8 ¶¶ 111–116, 120–123, 127–129.  As noted above, the asserted claims recite characteristics "indicative of" various subjects, such as a mobile device, performance of a mobile device, and a network, rather than characteristics "of" those subjects.  The phrase "indicative of," therefore, modifies the scope of the claimed characteristics such that some characteristics *indicative of* a mobile device / performance / a network may be characteristics *of* the recited subjects, and some may not.  *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim[.]"); *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553 (Fed. Cir. 1995) (A court "must give meaning to all the words in [the] claims.").  However, the independent claims are completely silent on what characteristics are included within or excluded from the claim scope.  Ex. 8 ¶¶ 111–116, 120–123, 127–129.

The dependent claims provide no guidance.  For example, dependent Claim 4 of the '811 Patent recites: "the one or more characteristics indicative of the mobile device corresponding to the selected mobile device model include *at least* one of processor type, processor speed, storage access speed, RAM size, storage size, display width, display height, pixel depth, processor availability, RAM availability or storage availability" (emphasis added).  Because Claim 4 uses "at least" before listing the specific characteristics, and applying the principle of claim differentiation, a POSITA would have understood that independent Claim 1 (from which Claim 4 depends) encompasses other characteristics that are not explicitly listed in Claim 4.  *Clearstream Wastewater Systems, Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446, 54 U.S.P.Q.2d 1185 (Fed.

23

Cir. 2000) ("Under the doctrine of claim differentiation, it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims.").  However, as Dr. Chatterjee explained, such claim language provides no guidance as to what those other characteristics may be.  Ex. 8 ¶¶ 111–116, 120–123, 127–129.

The specification also fails to clarify the meaning of the "indicative of" terms.  Wapp concedes the specification merely contains examples of the claimed characteristics, but contends those examples sufficiently describe the scope of "indicative of."  Op. Br. at 21–24.  This is not true.  For example, for characteristics "indicative of" a mobile device, the specification at best describes a few examples such as processor speed, storage access speed, RAM size, display width. *See, e.g.,* '811 Patent at Table 1.  But where does the list of characteristics indicative of a mobile device end?  Is the color of a device indicative?  What about the device width and length?  The bezel shape?  Camera quality and performance?  Pixel resolution?  Compatible audio and video codecs and containers?  Security settings?  Fingerprint or facial recognition?  GPS manufacturer?  Characteristics of built-in orientation sensors, accelerometers, magnetometers, and gyroscopes?  The specification lacks any guideposts for determining what characteristics are or are not "indicative of" various aspects of a mobile device in the context of the claims.  As Dr. Chatterjee explained in his declaration, the limited examples in the specification fail to inform a POSITA of the claim term's scope with reasonable certainty, *i.e.*, what does ***not*** constitute the claimed "***indicative* of**" characteristics.  Ex. 8 ¶¶ 114–115, 122–123, 129.  This is the precise fact pattern in which courts have repeatedly found terms indefinite.  *See, e.g.*, *Evicam Int'l, Inc. v. Enf't Video, LLC*, No. 4:16-CV-105, 2016 WL 6470967, at *19–20 (E.D. Tex. Nov. 2, 2016) (finding "extended periods of time" indefinite because the example in the specification failed to provide objective guidance for evaluating the term's meaning); *Versata Software, Inc. v. Zoho Corp*., 213 F. Supp.

3d 829, 836–37 (W.D. Tex. 2016) (finding "space-constrained display" indefinite because specification's "examples of when something constitutes a space-constrained display" "provide[d] no information as to what falls outside the boundaries of the claims"); *Prolifiq Software Inc. v. Veeva Sys. Inc.*, No. C 13-03644 SI, 2014 WL 3870016, at *6–8 (N.D. Cal. Aug. 6, 2014) (finding "differently versioned" indefinite where examples in the specification did not explain "when two digital content elements *are not* different version of each other") (emphasis in original).

The prosecution history confirms the ambiguity of "indicative of" in the asserted claims. Wapp does not, and cannot, deny that during the prosecution of the '579 Patent, the patent examiner rejected the original claim language, "one or more characteristics *indicative of* the selected mobile device type," finding the language indefinite.  Ex. 52 at 3.  In response, Wapp did not argue the term was definite.  Instead, Wapp deleted "indicative of" and changed the rejected term to "one or more characteristics *of* a selected mobile device type." *Id.*, 15–20.  Wapp further responded to the same office action by deleting "indicative of a network" from numerous claims that previously recited one or more characteristics "indicative of" a network.  *Id.*  The examiner then issued the Notice of Allowance.  *Id.*, 22–23.  Wapp's decision to replace the term "indicative of" with "of" to overcome the examiner's rejection confirms Wapp's understanding that "indicative" would introduce ambiguity to the claim language, something that Wapp has sought to use to its advantage. Ex. 8 ¶¶ 117, 124, 130.  The ambiguity in the "indicative of" terms therefore derives from Wapp's deliberate patenting strategy and should not escape scrutiny under 35 U.S.C. § 112.

Struggling to explain the '579 Patent's file history, Wapp resorts to a shotgun approach with multiple arguments, none of which is valid.  *First*, Wapp argues that "indicative of," removed during the '579 Patent's prosecution, is "a different term than those at issue here."  Op. Br. at 24. But the term at issue in this case is precisely "indicative of."  *Second*, Wapp attempts to

25

mischaracterize the '579 Patent's file history, arguing that nothing in the record suggests "indicative of" "had anything to do with the examiner's rejection." *Id.* To the contrary, as explained above, the examiner explicitly found "indicative of" to be indefinite, and Wapp replaced "indicative of" with "of" to overcome the examiner's rejection.

**Third**, Wapp seems to suggest the '579 Patent's file history carries no weight because the same examiner allowed similar claims in other patents that issued before the '579 Patent. Op. Br. at 24. However, the earlier file histories of other patents do not alter the '579 Patent's prosecution history. Nor do they contradict the fact that Wapp understood the term "of" to be clearer than "indicative of" but nonetheless chose to take advantage of the ambiguity provided by "indicative of." Nor has Wapp provided any legal support for its position that the '579 Patent's prosecution history carries no weight in determining the meaning of the term at issue. In fact, both the Federal Circuit and this District have found the opposite: "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application." *Microsoft Corp. v. Multi-Tech Sys., Inc*., 357 F.3d 1340, 1349 (Fed. Cir. 2004); *NTP, Inc. v. Rsch. In Motion, Ltd*., 418 F.3d 1282, 1293 (Fed. Cir. 2005) (similar); *Uniloc USA, Inc. v. AVG Techs. USA, Inc*., No. 2:16-CV-00393, 2017 WL 3498496, at *7 (E.D. Tex. Aug. 16, 2017) (holding that prosecution histories of related applications were relevant for claim construction).

Unable to find sufficient intrinsic support, Wapp cites to extrinsic evidence to argue that "indicative of" has "a well understood English meaning." Op. Br. at 21–23. Wapp's argument misses the point. Defendants do not challenge the meanings of "indicative of" in English linguistics or in the abstract—the issue here is Wapp's use of the phrase ***in the claims*** to intentionally introduce ambiguity to the asserted claims. And none of the extrinsic evidence cited

26

resolves this ambiguity.  For example, Wapp cites to the definition of "indicate" in Merriam-Webster's Collegiate Dictionary Tenth Edition (Op. Br. at 21), yet that dictionary has multiple definitions of "indicate" including: "1 a: to point out or point to [;] b: to be a sign, symptom, or index of [;] c. to demonstrate or suggest the necessity or advisability of [;] 2: to state or express briefly."  Ex. 38.  These varying definitions in no way define or clarify which characteristics are or are not "indicative of" a mobile device, network, or performance.

As another example, the writings of Defendants' expert, Dr. Chatterjee, and Defendants' publications cited by Wapp (Op. Br. at 22) once again demonstrate "indicative of" is a malleable phrase whose meaning depends on the specific context.  As Dr. Chatterjee detailed, the terms "indicative of" and "indicate" as used in his publications and expert declarations have different meanings that vary in a wide variety of contexts, none of which relates to the subject matter of the asserted patents.  Ex. 8 ¶ 135 (describing the context for each instance).  The same is true for Defendants' patents and published applications.  *Id.* ¶ 137.  Indeed, as Dr. Chatterjee pointed out, the mere fact that "indicative of" is used in other contexts does not provide a reasonable certainty for the meaning of the term in the context of the asserted patents.  *Id.* ¶ 45.

Finally, the *Uniloc 2017* case Wapp cited confirms the indefiniteness of the term in the Wapp patents.  *Uniloc 2017 LLC v. Google LL,* No. 2:18-CV-00493-JRG-RSP, 2020 U.S. Dist. LEXIS 9748, at *106 (E.D. Tex. Jan. 20, 2020).  First, *Uniloc 2017* is distinguishable from this case as indefiniteness was not at issue.  *Id.*  Second, absent an indefiniteness dispute, the court in *Uniloc 2017* acknowledged that "indicative of" may entail different meanings, and the court was only able to construe the term based on specific disclosures in the specification.  *Id.*  Here, the Wapp specifications provide no such guidance and there is no way to determine, with reasonable certainty, the bounds of the claims.

Because neither the intrinsic nor the extrinsic evidence informs a POSITA with reasonable certainty of the scope of the "indicative of" terms, the phrase "indicative of" is indefinite.  Ex. 8 ¶¶ 118, 125, 131.

> **E.** **"the selected characteristics"**

| Term (Patent/Claim) | Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "the selected characteristics"<br><br>('579 Patent, Claim 1) | Plain and ordinary meaning. | Indefinite |

Claim 1 of the '579 Patent recites loading "the selected characteristics" without any antecedent basis.  Claim 1 first recites a user can "select" a "mobile device," and that the software instructions simulate "one or more characteristics" of the selected device.  But the claim never recites "selecting" any of these characteristics; therefore, there is no antecedent basis for which "selected" characteristics are loaded.  The relevant claim limitations are below:

> 1.    A non-transitory, computer-readable medium comprising software instructions for developing an application to be run on a mobile device, wherein the software instructions, when executed, cause a computer to:
>
> display a list of one or more **mobile device types** from which **a user can select**;
>
> simulate **one or more characteristics of a selected mobile device type**;
>
> initiate loading of at least one of **the selected characteristics** from at least one of a remote server and a computer-readable media …

The plain claim language provides no basis for identifying which characteristics are the "selected" characteristics, and thus this claim term lacks a reasonably ascertainable meaning rendering it indefinite.  *Bushnell*, 813 F. App'x at 526.  Dr. Chatterjee explained a POSITA would not be able to discern, based on the claim language or intrinsic evidence, which characteristics are the "selected" characteristics.  Ex. 8 ¶¶ 93–107.  He noted the only prior selection in the claim

refers to a mobile device type, and not any characteristics, confirming that the first claim limitation could not provide antecedent basis. *Id.* ¶ 95.  Dr. Chatterjee also explained that the "one or more characteristics" in the second limitation cannot provide antecedent basis because those characteristics are not identified as being "selected" by anyone or anything. *Id.*  Dr. Chatterjee also considered whether reading the claim steps in a different order would clarify the limitation and concluded it would not. *Id.* ¶ 97.

The language of claim 15 in the '579 Patent reinforces this conclusion.  Claim 15 expressly recites in the first limitation "select one or more characteristics associated with a mobile device." Thus, in contrast to claim 1, claim 15 expressly recites the step of selecting characteristics.  Claim 1 contains no such limitation, confirming that the term "the selected characteristics" in claim 1 lacks antecedent basis.  It would violate settled law to import the limitation of claim 15 into claim 1 for the purpose of providing antecedent basis. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1362 (Fed. Cir. 1998) (noting it is "improper to import limitation from one claim into another claim lacking the limitation").

The file history provides further support.  In a November 18, 2019 amendment, Applicant expressly amended to change "the one or more characteristics" to "the selected characteristics":

> simulate one or more characteristics ~~indicative~~ of a [[the]] selected mobile device type;
> initiate ~~down~~loading of at least one of the <u>selected</u> ~~one or more~~ characteristics ~~indicative~~ ~~of the selected mobile device type~~ from <u>at least one of</u> a remote server <u>and a computer-readable</u> <u>media</u>;

Ex. 48, at 1.  Thus, Applicant expressly changed the reference so the phrase "the selected characteristics" did not refer back to "the one or more characteristics."  Dr. Chatterjee identified this as further support that the claim term "the selected characteristics" does not have a reasonably ascertainable meaning. Ex. 8 ¶ 102.

Wapp argues the term "the selected characteristics" refers back to the "one or more

characteristics of a selected mobile device type."  Op. Br. at 26.  This argument simply attempts to rewrite the claim language, which this Court has recently confirmed is improper.  *Intelligent Agency, LLC v. 7-Eleven, Inc.*, No. 4:20-cv-0185-ALM, 2022 WL 760203, at *34 (E.D. Tex. Mar. 11, 2022) (holding claim term indefinite and rejecting attempts to recharacterize plural claim language as singular because "Claim 1 does not actually recite this hypothetical language.  Instead, the Court would have to improperly redraft the claim as Plaintiff proposes").  Moreover, Wapp fails to explain which of these "one or more" characteristics represent the "selected" characteristics (is it all?), nor does Wapp identify which actor performs the selection.  Finally, Wapp's argument violates long-settled law by attempting to recapture the claim scope surrendered during prosecution.  *See, e.g.*, *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 33 (1966) ("claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent").  Wapp attempts to evade the effect of its amendment during prosecution by arguing that "the applicant, having deleted the words 'indicative of' from the preceding term, wished to amend the subsequent term to maintain consistency."  Op. Br. at 27.  But that argument makes no sense and is inconsistent with the claim amendment.  The deletion of "indicative" did not require any alteration to the phrase "the one or more characteristics."  Yet Applicant chose to not only delete "indicative," but also to replace "the one or more characteristics" with "the selected characteristics," introducing uncertainty into the claim.  Specifically, because the claim never recited any selecting any of the "one or more characteristics," the amendment introduced a new claim term—"the selected characteristics"—without any antecedent basis or reasonably ascertainable meaning.  The Court should therefore find this limitation indefinite.

## V.   CONCLUSION

For the foregoing reasons, Defendants' proposed constructions should be adopted.

Dated: June 2, 2022

Respectfully submitted,

*/s/ Timothy S. Durst*

Timothy S. Durst
Texas State Bar No. 00786924
tdurst@omm.com
**O'MELVENY & MYERS LLP**
2501 North Harwood Street
Suite 1700
Dallas, TX 75201-1663
Telephone: 972-360-1900
Facsimile: 927-360-1901

Marc J. Pensabene (*Pro Hac Vice*)
New York State Bar No. 2656361
mpensabene@omm.com
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Telephone: 212-326-2000
Facsimile: 212-326-2061

Darin Snyder (*Pro Hac Vice*)
California State Bar No. 136003
dsnyder@omm.com
Bill Trac (admitted to E.D. Tex.)
California State Bar No. 281437
btrac@omm.com
Rui Li (*Pro Hac Vice*)
California State Bar No. 320332
rli@omm.com
**O'MELVENY & MYERS LLP**
Two Embarcadero Center
28th Floor
San Francisco, CA 94111
Telephone: 415-984-8700
Facsimile: 415-984-8701

***Attorneys for Bank of America N.A.***

31

Dated: June 2, 2022                                  Respectfully submitted,

                                                     /s/ E. Danielle T. Williams
                                                     Thomas M. Melsheimer
                                                     Texas State Bar No. 13922550
                                                     TMelsheimer@winston.com
                                                     Katrina G. Eash
                                                     Texas State Bar No. 24074636
                                                     KEash@winston.com
                                                     William G. Fox, Jr.
                                                     Texas State Bar No. 24101766
                                                     WFox@winston.com
                                                     Steven R. Laxton
                                                     Texas State Bar No. 24120639
                                                     SLaxton@winston.com
                                                     WINSTON & STRAWN LLP
                                                     2121 N. Pearl Street, Suite 900
                                                     Telephone: (214) 453-6500
                                                     Facsimile: (214) 453-6400

                                                     Elizabeth Danielle T. Williams
                                                     North Carolina State Bar No. 23283
                                                     DWilliams@winston.com
                                                     WINSTON & STRAWN LLP
                                                     300 South Tryon Street, 16th Floor
                                                     Charlotte, NC 28202
                                                     Telephone: (704) 350-7790
                                                     Facsimile: (704) 350-7800

                                                     Matthew R. McCullough
                                                     California State Bar No. 301330
                                                     MRMcCullough@winston.com
                                                     WINSTON & STRAWN LLP
                                                     255 Shoreline Drive, Suite 520
                                                     Redwood City, CA 94065
                                                     Telephone: (650) 858-6500
                                                     Facsimile: (650) 858-6550

                                                     **Attorneys for Defendant**
                                                     **WELLS FARGO BANK, N.A.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  Therefore, this document was served on all counsel who are deemed to have consented to electronic service pursuant to Local Rule CV-5(a)(3)(A).


<u>/s/ *Timothy S. Durst*   </u>
Timothy S. Durst